**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

STEVE PICK,

               Plaintiff,

vs.

CITY OF REMSEN, PAIGE LIST,
RACHAEL KEFFELER, KIM
KELEHER, JEFF CLUCK, CRAIG
BARTOLOZZI, and KEVIN ROLLINS,

               Defendants.

No. C13-4041-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

---

**TABLE OF CONTENTS**

I.    **INTRODUCTION**..................................................................3
    A.    *Factual Background* ......................................................3
        1.    *The parties*.............................................................3
        2.    *The Manual* .........................................................4
        3.    *Pick's interactions with List* ................................6
        4.    *Allegations about missing money*.........................7
        5.    *Trail camera in Pick's office*................................8
        6.    *Request for audit* ................................................9
        7.    *Online banking and completion of rate study*......11
        8.    *Pick's medical leaves and related activities*.........11
        9.    *Elimination of Pick's position* .........................16
        10.   *Aftermath* ..........................................................16
    B.    *Procedural Background* .........................................17
II.   **LEGAL ANALYSIS** ......................................................18
    A.    *Summary Judgment Standards*.................................18
    B.    *Defamation Claims* ...............................................24
        1.    *Applicable law* ..................................................25
        2.    *Application of the law* .......................................28
            a.    *Missing money*...............................................28

|  |  | *i.* | *Truth* ......................................................... 28 |
|  |  | *ii.* | *Qualified privilege* ...................................... 31 |
|  |  | *b.* | *Hiding or altering documents* ...................... 34 |
|  |  | *c.* | *Other defamation allegations* ..................... 35 |
| *C.* | *Section 1983 Claims* ................................................. 36 |
|  | *1.* | *Claim against Bartolozzi* ........................................ 37 |
|  | *2.* | *Claims against Rollins and Cluck* ..................... 37 |
|  | *3.* | *Claim against the City* ...................................... 41 |
| *D.* | *Intentional Infliction Of Emotional Distress Claims* ....................... 42 |
| *E.* | *Wrongful Termination In Violation Of Employee Manual* ............... 43 |
| *F.* | *Disability Discrimination Claims* ............................................... 44 |
|  | *1.* | *The analytical framework* ................................................ 45 |
|  | *2.* | *Prima facie case* ....................................................... 46 |
|  |  | *a.* | *Disability* ............................................................... 47 |
|  |  | *b.* | *Other requirements* ............................................... 49 |
|  | *3.* | *Nondiscriminatory reason for action* ................................ 49 |
|  | *4.* | *Showing of pretext* .......................................................... 49 |
| *G.* | *Age Discrimination Claims* ............................................................ 51 |
|  | *1.* | *The analytical framework* ................................................ 51 |
|  | *2.* | *Prima Facie case* ........................................................ 53 |
| *H.* | *Gender Discrimination Claims* ...................................................... 54 |
| *I.* | *Retaliation Claims* ...................................................................... 54 |
|  | *1.* | *ADA/ICRA retaliation claim* ........................................... 55 |
|  | *2.* | *First Amendment retaliation* ........................................ 58 |
| *III.* | *CONCLUSION* ............................................................................... 59 |

The former long-time operations director of a city's utilities department brings diverse but related claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C.

§ 12101 *et seq.*, the Iowa Civil Rights Act ("ICRA"), Iowa Code Ch. 216, 42 U.S.C. § 1983; the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, Title VII of the federal Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17, and pendent state law claims for defamation, intentional infliction of emotional distress, and wrongful termination against his former employer, supervisors, co-employees, and city officials. Defendants assert that they are entitled to summary judgment on all of the plaintiff's claims, while the plaintiff asserts that a reasonable jury could find in his favor on most, but not all, of his claims.

## I.     INTRODUCTION

### A.     Factual Background

As is my usual practice, I set out only those facts, disputed and undisputed, sufficient to put in context the parties' arguments concerning the defendants' motion for summary judgment. Unless otherwise indicated, the facts recited here are undisputed, at least for the purposes of summary judgment. I will discuss additional factual allegations, and the extent to which they are or are not disputed or material, if necessary, in my legal analysis.

### 1.     The parties

Plaintiff Steve Pick resides in Remsen, Iowa. He was formerly employed as Operations Director of Remsen Municipal Utilities ("the Utility" or "Utility"). Defendant City of Remsen ("the City") is a municipality in the State of Iowa. Defendant Paige List resides in Remsen and is the City's Clerk. Defendant Rachael Keffeler resides in Remsen and is the City's Deputy Clerk. Defendant Kim Keleher resides in Remsen and is a member of the Utility's Board of Directors ("the Utility Board"). Defendant Jeff Cluck resides in Remsen and is the City's Mayor. Defendant Craig Bartolozzi resides

in Remsen and is the City's former Mayor. Bartolozzi is currently the Utility Board's Chairman and is employed by the Plymouth County Sheriff. Bartolozzi, while Remsen's Mayor, asked then Utility Board members Steve Matgen and Tom Bacan to fire Pick. Bartolozzi also expressed his dissatisfaction with Pick to Don Kolker, another former Utility Board member.

There is a factual dispute about whether Mayor Cluck asked Don Kolker, then a Utility Board member, to fire Pick. Cluck denies this while Kolker contends that Cluck asked him to do so.

In January 2012, the current Utility Board was seated. Keleher, Bartolozzi, and Dean Douvia were appointed by Mayor Cluck. Bartolozzi is the Chairman. On January 1, 2012, Craig Reiter started work as the Director of Utilities. Reiter was hired by the former Utility Board. When the current Utility Board members took office, Pick's work hours were 7:00 a.m. – 4:00 p.m. Pick's office was located in Remsen City Hall. The Utility Board instructed Pick to change his hours so that he worked from 8:00 a.m. – 5:00p.m., the hours that Remsen City Hall was open. In the spring of 2012, Pick completed an evaluation of Keffeler. Bartolozzi thought Pick's evaluation was unfair and that there was a lack of communication in the office.

## 2. The Manual

The City and the Utility have a "Manual of Personnel Policies and Administration" ("The Manual"). The Manual's introduction states:

> This manual of personnel policies and administration is designed to provide the employees of the City of Remsen and the Remsen Municipal Utilities a written record of the policies, responsibilities, rights, and benefits of their employment.

The Manual at 2; Defendants' App. at 110. Section 2.1 of the Manual was titled "Equal Employment Opportunity" and provides:

> No appointment to or termination from a position with the City of Remsen or the Remsen Municipal Utilities shall be affected or influenced in any manner by any consideration of race, creed, sex, age, national origin, political opinion, or handicap. All persons shall have equal access to positions, limited only by their ability to do the work. Promotions, advancement, and training opportunities will be awarded without regard to any of the factors outlined above.

The Manual at 2; Defendants' App. at 110. The Manual contains the following "definition" of the City Clerk/Treasurer position: "This is administrative work involving accounting and record keeping for the city council and all city departments. Also acts as chief administrator and supervisor of all city departments, except the police department." The Manual at 14; Defendants' App. at 111. The Manual also has the following "characteristics" of this position:

> Keeps records of licenses, permits and fees; keeps records of revenues and expenditures of city funds by modern and efficient accounting methods; attends and keeps records of all meetings of the city council as well as attend any committees/boards of the city as requested. Makes Treasurers reports to the city council and utility board and administrative reports to the city council; keeps personnel records; prepares payroll of city/utility employees; publishes ordinances; certifies documents. Performs other administrative duties at the direction of the City Council.

The Manual at 14; Defendants' App. at 111.

Section XII of the Manual governs termination of employment.[1] Paragraph 12.4 addresses discharge, suspension or demotion, and lists several examples of conduct

---

[1]There is no dispute between the parties concerning the Manual's provisions and I have accepted as true their representations of those provisions since only three pages of the Manual are in the summary judgment record. *See* The Manual at 1, 2, and 14; Defendants' App. at 109-111.

constituting cause for discharge. The Manual provides that an employee, before dismissal, is entitled to an oral hearing before that employee's department head at which the employee is allowed to state their case. The Manual also states that, after an employee has the right to appeal his or her dismissal to the Remsen City Council ("City Council") or the Utility Board.

### 3. Pick's interactions with List

In July 2011, Pick published in minutes in the local newspaper that the Utility Director (Pick), had asked that the Clerk, List, get reports to him in a more timely fashion. List was "appalled" and "upset" by Pick's action, which she viewed as a public attack on her. List Dep. at 18-19; Plaintiff's App. at 38-39. As a result of Pick's action, List made a request to the City Council to remove from her duties the preparing of the Utility Treasurer report. List's request was granted in July 2011. After this occurred, List viewed her relationship with Pick as "Just not good. Downhill." List Dep. at 20; Plaintiff's App. at 40. Subsequently, two meetings were held with Pick, List, members of the Utility Board and members of the City Council to address issues in the working relationship between Pick and List. List believed that Pick persuaded people to call her at the office and harass her. The only evidence supporting her belief was that Pick knew the individuals who called List.

On January 12, 2012, List emailed new Remsen Mayor Jeff Cluck to inform him about how uncomfortable she and Keffeler were working with Pick. In her email, List wrote in pertinent part:

> I feel VERY uncomfortable working at this office, knowing the person right next to me is going to try to sue me, amongst all the other things that have occurred.
>
> I told Barry I would like to request that he be removed from this building and temporarily be moved to the utility shop or somewhere else. Either that, or I am requesting personal leave of absence, and can still do most my [sic] work that

needs to be done at home or come in after hours to get it done. I prefer the first, as I know Rachel feels extremely uncomfortable also, and I wouldn't want to leave her alone with him. Rachel and I don't know why we have to be the ones being punished through this whole deal when we didn't do anything wrong?

Please advise. Thanks.

List Email at 1; Plaintiff's App. at 118.

### 4. Allegations about missing money

Around November 30, 2011, List told then Mayor Bartolozzi that Adam Gesink and Ben Jungers, Utility workers, told her that Terry Maass, another Remsen utility worker, told them that he and Steve Pick found money in the desk of Ron Mayer, a deceased Utility employee, and that Pick took the money from the desk, telling Maass that he would "take care of it."[2] List Dep. at 26; Defendants' App. at 43. Gesink and Jungers came to the Utility office to give a check to Rachael Keffeler and told her the story, which List overheard. Initially, List told the story to Bartolozzi in the form of a hypothetical, without mentioning any names. After Bartolozzi questioned her about the story, List related the story as originally told by Gesink and Jungers.

List never related this story to Pick. Instead, Pick learned about the allegation from Maass. Maass told Pick that Remsen Police Officer Michael Sparr told Maass that List made this allegation to Bartolozzi. Bartolozzi had a conversation with Pick about the missing money. Pick told Bartolozzi that he didn't know anything about any money being found. Pick asked Bartolozzi why List accused him of stealing the money. Bartolozzi replied that he did not know. Pick took Bartolozzi's answer as confirmation that List had accused him of stealing money.

---

[2]Bartolozzi remembers List telling him that the amount of money was $3,000.

7

Bartolozzi claims that he never said anything to Sparr about missing money. Sparr, however, claims that Bartolozzi asked him if he had heard anything about money missing from Mayer's desk. Sparr went to Maass and asked about the missing money. Maass claims that he and Pick did not clean out Mayer's desk and that he never had a conversation with Gesink and Jungers on the subject.

### 5.　　Trail camera in Pick's office

At some point, Pick placed a trail camera in his office. The trail camera was movement activated, taking a still photograph and then a 15 to 20 second video.[3] On January 3, 2012, Remsen Chief of Police Kevin Rollins removed Pick's trail camera and the trail camera's memory card from Pick's office. He looked for an on/off switch and could not find one, so he opened the camera, removed the memory card, shut the camera off and placed everything in a bag. Rollins later stored the bag in an evidence closet at the Remsen Police Department.

Rollins has been Remsen's Chief of Police for 34 years. Rollins did not apply for a search warrant prior to seizing Pick's trail camera. At the time Rollins removed Pick's trail camera, he knew it was Pick's property. Rollins removed Pick's trail camera because he didn't believe that there was any reason for the trail camera to be in Pick's office and because Mayor Cluck requested that he remove it. Bartolozzi was not involved in the seizure of Pick's trail camera. Pick was out of town, on vacation, when his trail camera was removed. When Pick returned from vacation, he discovered that the trail camera had been removed and asked Rollins to return it. Rollins refused until he was

---

[3]The City has a municipal ordinance that prohibits electronic and mechanical eavesdropping. The summary judgment record does not disclose if Pick's trail camera could make audio recordings.

given clearance by Mayor Cluck and/or the City Attorney. Pick then had his nephew, Michael Merrick, an attorney, write a letter to the city on January 11, 2012, demanding the return of Pick's trail camera. A few days later, Rollins returned Pick's trail camera.

When Pick left for vacation, he left the door to his office open, his computer on and his desk unlocked.[4] In the past, when other employees needed something on or in Pick's desk, and he was not in his office, they felt free to go and get it themselves.[5] The documents in Pick's desk and on his computer related to his work. The documents belonged to Pick's employer. The City owns the desk and the computer that were in Pick's office. The programs on Pick's computer were accessible on all of the other computers used by the Utility. Those programs, and the data they contained, belonged to Pick's employer. Pick never told anyone to stay out of his office if he was not there. The drawers on Pick's desk did not lock. Most of the contents of Pick's desk related to his work for the Utility. There was nothing on Pick's work computer that was confidential or sensitive.

### 6. *Request for audit*

On January 23, 2012, the Utility Board met in regular session. At the meeting, Remsen City Attorney Barry Thompson recommended that the "[deposit] account should be reviewed on a regular basis." Utility Board Minutes at 2; Plaintiff's App. at 146. He

---

[4]Pick denies that he left his computer on when he left for vacation. However, he has not cited anything in the summary judgment record which would contradict defendants' factual statement. Thus, I must assume that this portion of defendants' factual statement is correct.

[5]Pick denies that other employees felt free to get items from his desk when he was not there. Again, however, Pick has not cited anything in the summary judgment record which would contradict defendants' factual statement.

also recommended that the Utility Board "contact an independent auditor to perform and audit and review and correct any deficiencies that they may find." Utility Board Minutes at 2-3; Plaintiff's App. at 146-47. Keleher then moved to bring in an independent auditor to review "the Special Collections Account." Keleher's motion passed. Keleher also recommended that the Utility Board use an outside accounting firm, rather than the current City Auditor, "in order to bring in a fresh set of eyes to the situation."[6] Utility Board Minutes at 3; Plaintiff's App. at 147.

On January 26, 2012, Keleher sent an email to Mayor Cluck. In that email, Keleher wrote, in part:

> I believe Craig was going to Steve [Pick] and also have documents secured to prevent alteration or absconding with them even if Steve was going in after hours. Craig was going to direct Steve that he is not allowed in the office while on leave. Craig will take the lead on getting the audit secured . . . not Steve, and get it started asap. If there is wrong doing, it will all break loose, no matter if Steve is hiding or altering documents.

Keleher Email at 1; Defendants' App. at 73 (ellipsis in original). Mayor Cluck forwarded Keleher's email to List and Keffeler. When Keleher wrote that email, she and her fellow Utility Board members had been on the Utility Board for less than a month. She knew that at least one citizen was claiming there were "issues" with utility billings and collections. Keleher also wrote the email because she was shown a handwritten log in Pick's handwriting concerning utility deposits and she noticed that one of the listed deposits was one she had made but never got back.

---

[6]On February 28, 2012, auditors arrived and began their audit. The auditors had instructed the Utility Board to secure their books prior to the audit to ensure that they could not be altered.

Pick was on medical leave, but was going into work after hours. The Utility Board did not know why and did not approve this practice. In her January 26th email to Cluck, Keleher noted that Bartolozzi was going to tell Pick that he was not allowed in the office while on leave. Keleher subsequently acknowledged that while Pick's going into work after hours, while on leave, may have been seen as suspicious, there are possible valid reasons for a person to go back to their office after hours even if the person is on vacation or medical leave. Keleher had no evidence that Pick was altering or hiding documents.

### 7. Online banking and completion of rate study

The Utility Board asked Keffeler to look at the option of online bank statements so that it could monitor its accounts more closely. In the past, the account had been overdrawn on occasion. No one suggested that closer monitoring was needed because Pick had either done something wrong or failed to do something he should have done. Pick's name was never mentioned during the discussion. Pick interpreted the Utility Board's request as an insinuation that he was doing something wrong. At a regular meeting of the Utility Board, Keffeler noted in the minutes that a consultant's rate study was not yet complete because the consultant had not been provided with the information that he needed to complete the study.

### 8. Pick's medical leaves and related activities

On January 17, 2012, Pick was seen by Physicians Assistant Kay Kosters at the Family Medical Clinic in Le Mars, Iowa. He was seen due to his increased anxiety and stress, and difficulty sleeping. Pick reported that he had been experiencing the increased stress requiring medical attention for approximately two months. He also reported that he had been experiencing some increase stress for the prior year. PA Kosters prescribed medication to Pick to help with stress and sleep. On January 23, 2012, after a telephone call from Pick, PA Kosters provided Pick with a note to take 7 to 10 days off of work, Pick provided this note to Bartolozzi, who was the new Chairman of the Utility Board.

Over the next several months, List sent Mayor Cluck several more emails. In one of these emails, List again requested removing Pick from the Utility office. In others, List informed Mayor Cluck about the number of days off that Pick had taken and what hours Pick was putting down on his time cards.

At the February 21, 2012, the Utility Board "requested that Director Pick and Deputy Clerk get them a list of their day to day activities and responsibilities so that the board can gain a better understanding of what each employee does." Utility Board Minutes, Feb. 21, 2012, at 5; Plaintiff's App. at 153. As a result of this review, the Utility Board discovered that the monthly treasurer and director reports were done manually. The Utility Board purchased software so that these reports could be computer generated. The Utility Board also learned that Pick was responsible for taking and publishing minutes. The Utility Board had previously received citizen complaints that minutes were not being timely published. That task was reassigned to Keffeler.

On March 15, 2012, Pick returned to see PA Kosters for a follow up visit concerning his anxiety. Pick reported that the thought of going to work was difficult for him. PA Kosters diagnosis was anxiety/depression and recommended that Pick take off of work and see a counselor. PA Kosters provided Pick with a note to excuse him from work until April 9, 2012.

On April 6, 2012, Cluck emailed the entire Utility Board and requested that Pick be terminated, writing:

> OK guys when are we going to say enough is enough! I know I'm not in on everything you guys know and or have discussed about Steve but this thing needs to be put to bed. This guy is just pushing us to the breaking point and I believe we are at the point that a decision needs to be made now. The employees are all talking about it, not good. I believe we need to take action and get this City back on track for the good of the citizens. I know you guys need to have your ducks in a row before any action is taken but it just keeps piling up,

12

> when do you just say that's it???  I don't mean to sound harsh
> about this but I for one have never worked any place that
> would let me get away with the amount of things that Steve
> has done over the years, its [sic] time we do something.  I for
> one would not be able to work or lets [sic] say function to the
> fullest of my ability with what those two girls have had to put
> up with.  I would say they could wage a law suit against us
> for letting this go so long and making them work in these
> conditions.  He needs to be terminated not put on leave.  I
> take my hat off to you guys for the job you have been asked
> to do and are doing a very fine job might I add.  I have the
> utmost confidence you will do the right thing.

Cluck Email at 1; Plaintiff's App. at 131.

On April 9, 2012, List emailed Mayor Cluck that she believed that if Pick's employment were to end that "I'm not too sure he can't retire with full IPERS benefits next month."  List Email at 1; Plaintiff's App. at 122.  In that email, List also expressed her "hope this does get laid to rest. . . sooner than later!"  List Email at 1; Plaintiff's App. at 122 (ellipsis in original).

On May 21, 2012, the Utility Board promoted Reiter to Superintendent of Utilities.  Reiter assumed responsibility for meeting with all electrical and gas inspectors.  He also supervises and coordinates projects being handled by the Utility's field workers.  These duties were Pick's previously.

On June 13, 2012, Mayor Cluck discussed with Pick the fact that Cluck thought Pick was using too much sick leave.  On June 14, 2012, Cluck sent an email to Pick, confirming their conversation from the day before and concerning Pick's use of sick leave, writing:

> Thank you Steve.  I do apologize for jumping up and down
> your neck yesterday but I just get tired of this crap between
> you guys.  I here [sic] it from both sides not just one side.  I
> guess I just don't understand why you have been taking so
> much time off lately is why I asked about how many days

have you worked this month. I know you have sick days banked but sick days are for sick days not personal days. It just appears that they are being abused, I hope this is not the case. With Rachael out I would hope you can follow up with her work that we need done for the city, what that might be I have no idea. You will need to ask Paige what she needs from you to keep things rolling for both the city and the utilities department.

Cluck Email at 1; Plaintiff's App. at 90.

On June 15, 2012, Bartolozzi sent an email to the other Utility Board members and included List, Keffeler, and Mayor Cluck on that the email, but did not send the email to Pick. In the email, Bartolozzi states in part:

I think it's time to decide if the position of Utility Director is needed. If I remember correctly, this position was created when Meyer was supervisor of the crew, but was not getting anything done, nor could he get along with people. Now that we have made Craig a supervisor, and I think he will be able to handle the job well, so why have the extra position. Also I still think we need a city manager to be over Paige and Rachel and that person answer to both boards. We need to discuss the future of the utility board and its function.

Bartolozzi Email at 1; Defendants' App. at 75. At the next Utility Board meeting, on June 25, 2012, the issue of the need for the Utility Director position was not mentioned. Pick was present at the June 25th Utility Board meeting.

On June 26, 2012, List sent an email to Mayor Cluck informing him that Pick was gone from work again and that Pick had only been to work 9 out of the 21 work days that month. Also on June 26, 2012, Scott Hindman, Pick's attorney, sent a letter to Remsen City Attorney Barry Thompson. In the letter, Hindman informed Thompson of the mistreatment that Pick was experiencing and that he was considering taking legal action to enforce his rights under federal and state law. In closing, Hindman wrote:

> In lieu of a long, drawn out and expensive legal battle, Mr. Pick is willing to discuss a separation from his position with the Utilities Department in exchange for a reasonable severance package. If the City is willing to entertain such a proposal, please so inform me within 10 days so that negotiations can begin. If the City refuses Steve's reasonable proposal, he will be left with no option but to pursue his legal claims in court and I request that the City's insurance company be so informed.

Hindman Letter at 3; Plaintiff's App. at 89. On June 28, 2012, Keffeler sent an email to the Utility Board members informing them of a special closed session meeting on July 2nd with the Remsen City Council to discuss Hindman's letter.

On June 28, 2012, Pick was seen by Dan Gillette, M.D., a psychiatrist. Pick reported that he was experiencing a high level of stress at the time. Dr. Gillette diagnosed Pick with "Major depressive disorder, single episode, moderate. Adjustment disorder with anxious mood." Plaintiff's App. at 206. Dr. Gillette also noted that Pick was under a high level of work related stress and that Pick had difficulty functioning. Dr. Gillette recommended that Pick take a leave of absence from work, and gave him a note excusing Pick from work until July 16, 2012. Pick gave Dr. Gillette's note to Bartolozzi.

During Pick's leaves from work, the Utility Board assigned some of Pick's "office" work to Keffeler. Keffeler began assembling meeting packets and the agenda for Utility Board meetings. She was also given the authority to code invoices, sign checks, and pay bills. Keffeler also started reconciling monthly bank statements and took on more of the responsibility for dealing with questions from Utility customers regarding such matters as billing errors, complaints, and establishing new accounts.

On July 12, 2012, Dr. Gillette again saw Pick. Pick again reported that he was experiencing a high level of work related stress. Dr. Gillette's diagnosis remained major depressive disorder and he recommended that Pick continue his medical leave.

Dr. Gillette gave Pick a note excusing him from work for three weeks. This note was emailed to Bartolozzi. Bartolozzi, in turn, forwarded Pick's email to Keffeler, List, Keleher, Cluck, and Dean Douvia.

### 9.    *Elimination of Pick's position*

On July 16, 2012, the Utility Board voted to eliminate Pick's position. Pick was not present at the Utility Board's meeting on July 16, 2012. Pick was sent a letter the following day from Bartolozzi informing him that his position had been eliminated effective "immediately." Pick was instructed to return all keys and other city property. Pick's job was not eliminated for any of the reasons identified in § 12.4 of the Manual.

### 10.    *Aftermath*

On July 27, 2012, Pick saw Dr. Gillette again. Pick continued to be very emotionally distraught regarding the situation. Dr. Gillette's diagnosis remained major depressive disorder and anxiety disorder.

On some undisclosed date, Pick filed a complaint with the Iowa Civil Rights Commission ("ICRC"). In their response to the ICRC complaint, defendants stated: "In the end, Steven Pick's own behavior led the Board to ask whether it needed a Utility Operations Director. After more than six months of study and inquiry, it became clear that the answer was 'no'". Plaintiff's App. at 115. Bartolozzi signed a sworn affidavit attesting to the truth of the response to the Iowa Civil Rights Commission complaint. Douvia and Bartolozzi, however, have testified that the Utility Board did not engage in any studies to determine if Pick's position was needed. Keleher testified that the only research or study she did on the issue of reorganizing the Utility department was just "trying to understand what everybody was doing." Keleher Dep. at 17; Plaintiff's App. at 46.

The minutes of the Utility Board meetings from January 2012 through June 2012, contain no mention of the possible elimination of the Utility Director position. Pick was

never informed by any member of the Utility Board at that time that they were considering eliminating his position or reorganizing the Utility department.

### B. Procedural Background

On April 19, 2013, Pick filed this case in the Iowa District Court for Plymouth County. His state court petition named six defendants: The City, List, Keffeler, Cluck, Bartolozzi, and Rollins. Pick asserted the following claims: (1) libel/slander, (2) violations of constitutional rights, brought pursuant to 42 U.S.C. § 1983, (3) intentional infliction of emotional distress, (4) wrongful termination (violation of employee manual), (5) wrongful termination (disability), brought pursuant to the Iowa Civil Rights Act, (6) wrongful termination (age), also brought pursuant to the Iowa Civil Rights Act and, (7) retaliation.

Defendants removed this action to this court on May 9, 2013, invoking federal question jurisdiction with regard to the constitutional claims and supplemental jurisdiction over the remaining, state law claims. Defendants then filed an answer to the state court petition. On May 28, 2013, Pick filed an amended complaint adding federal disability and age discrimination claims to his existing state law claims.

On June 13, 2013, Pick filed a motion to amend the complaint, along with the proposed amended pleading, seeking to add a new defendant, Keleher. Defendants did not resist the motion. Pick's motion was granted and Pick's second amended complaint was filed.

On August 29, 2013, Pick filed another motion to amend, again with a proposed amended pleading. With this amendment, Pick sought to add an additional cause of action: wrongful discrimination and termination (gender) in violation of the federal and Iowa Civil Rights Act. Again, the defendants did not object. The motion was granted and Pick's third amended complaint was filed.

On February 3, 2014, Pick filed another motion for leave to amend the complaint. Pick's motion was denied without prejudice because it violated several local rules and did not address the fact that the deadline for amendments had expired five months earlier. On February 10, 2014, Pick filed a new motion for leave to amend the complaint, along with the proposed fourth amended complaint. Pick sought to add new factual allegations to two of his existing claims, along with a new cause of action for intentional interference with employment contract and to assert a violation of procedural due process. Defendants objected to the proposed amendment. Defendants argued, inter alia, that the proposed amendment was untimely and they would be unfairly prejudiced by it. Pick's motion was granted in part and denied in part on February 25, 2014. Pick was permitted to amend his complaint to add a new allegation of defamation in Count I, but his other proposed amendments were denied.[7]

On February 28, 2014, Pick filed his fourth amended complaint. For a variety of reasons, defendants seek summary judgment on all of Pick's claims. Pick filed a timely response to defendants' motion for summary judgment in which he resists some, but not all, of defendants' motion for summary judgment.

## II.    LEGAL ANALYSIS

### A.    Summary Judgment Standards

Motions for summary judgment essentially "define disputed facts and issues and . . . dispose of unmeritorious claims [or defenses]." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 585 (2007) (internal quotation marks and citation omitted); *see Celotex*

---

[7]Because Pick's attempt to amend the complaint to assert a procedural due process claim was denied, I do not read the fourth amended complaint to assert such a claim.

*Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . ."). Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is material when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," Woods, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence").

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue," *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323), and demonstrating that it is entitled to judgment according to law. *See Celotex*, 477 U.S. at 323 ("[T]he motion may, and should, be granted so long as whatever is

before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))).

As the Eighth Circuit Court of Appeals has explained,

> "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, ---U.S. ----, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) *quoting Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal quotations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," and must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Ricci*, 129 S. Ct. at 2677, *quoting Matsushita*, 475 U.S. at 587, 106 S. Ct. 1348.

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1042-43 (8th Cir. 2011) (en banc).

In its *en banc* decision in *Torgerson*, the Eighth Circuit Court of Appeals expressly rejected the notion that summary judgment in employment discrimination cases is considered under a separate standard, citing *Reeves* and *Celotex*.[8] Instead, the court held as follows:

> Because summary judgment is not disfavored and is designed for "every action," panel statements to the contrary are unauthorized and should not be followed. There is no "discrimination case exception" to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial.

---

[8] The Eighth Circuit Court of Appeals had previously recognized, in a number of panel decisions, that summary judgment is "disfavored" or should be used "sparingly" in employment discrimination cases. *See Torgerson*, 643 F.3d at 1043 (collecting such cases in an Appendix). The rationales for this "employment discrimination exception" were that "discrimination cases often turn on inferences rather than on direct evidence. . . .," *E.E.O.C. v. Woodbridge Corp.*, 263 F.3d 812, 814 (8th Cir. 2001) (*en banc*) (citing *Crawford*, 37 F.3d at 1341; *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999)), and that "intent" is generally a central issue in employment discrimination cases. *See, e.g., Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1071 (8th Cir. 1998) (citing *Gill v. Reorganized Sch. Dist. R-6, Festus, Mo.*, 32 F.3d 376, 378 (8th Cir. 1994)); *see Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 (8th Cir. 2005) (noting summary judgment is disfavored in employment discrimination cases because they are "'inherently fact-based.'" (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 806 (8th Cir. 2003))). On the other hand, the Supreme Court recognized that, even in employment discrimination cases, "'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

*Torgerson*, 643 F.3d at 1043.[9]  Therefore, I will consider the defendants' motion for summary judgment in this employment discrimination case according to the same standards that I would apply in any other civil case.

However, I must first observe that stating the legal principles of summary judgment in employment discrimination cases is a simple task.  Applying those principles to the paper record that forms the judicial crucible that decides which plaintiffs may proceed to trial and which get dismissed on a paper record is far more daunting.  Missing in the standard incantation of summary judgment principles is the role of experience.  Justice Oliver Wendell Holmes wrote, "The life of the law has not been logic; it has been experience."  OLIVER WENDELL HOLMES, THE COMMON LAW 1 (1881).  Thus, experience teaches that thoughtful deliberation of summary judgment in employment discrimination cases is grounded in the consideration of each case through a lens filtered by the following observations.

Employment discrimination and retaliation, except in the rarest cases, are difficult to prove.  They are perhaps more difficult to prove today—fifty years after the passage of the EPA, more than forty years after the passage of Title VII and the ADEA, more than twenty years after the passage of the ADA, and nearly two decades after the passage of the FMLA—than during the earlier evolution of these anti-discrimination and anti-retaliation statutes.  Today's employers, even those with only a

---

[9]Courts' use of summary judgment and motions to dismiss to dispose of EPA claims has increased dramatically.  Review of EPA appellate cases reveals that, in the 1970's, 97% of EPA decisions had been resolved by bench or jury trials, rather than motions to dismiss or for summary judgment; in the 1980's, the rate of EPA claims resolved by trial declined to 92%; in the 1990's, the rate dipped to 42%, and from 2000 to 2009, to a mere 31%.  Deborah Thompson Eisenberg, *Shattering the Equal Pay Act's Glass Ceiling*, 63 SMU L. REV. 17, 33 (2010).  The dramatic decline in trials in EPA cases raises serious concerns about the expanded use of dispositive motions to eliminate trial by juries.

scintilla of sophistication, will neither admit discriminatory or retaliatory intent, nor leave a well-developed trail demonstrating it. *See, e.g., Riordan v. Kempiners*, 831 F.2d 690, 697-98 (7th Cir. 1987). Indeed, the Fifth Circuit Court of Appeals recognized more than thirty-five years ago, that "[a]s patently discriminatory practices become outlawed, those employers bent on pursuing a general policy declared illegal by Congressional mandate will undoubtedly devise more sophisticated methods to perpetuate discrimination among employees." *Rogers v. EEOC*, 454 F.2d 234, 239 (5th Cir. 1971) (later relied on by the Supreme Court in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65-67 (1986), as one of the principal authorities supporting recognition of a cause of action for hostile environment sexual harassment under Title VII).

My experience suggests the truth of that observation. Because adverse employment actions almost always involve a high degree of discretion, and most plaintiffs in employment discrimination and retaliation cases are at will, it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge. This is especially true, because the very best workers are seldom employment discrimination and retaliation plaintiffs due to sheer economics: Because the economic costs to the employer for discrimination or retaliation are proportional to the caliber of the employee, discrimination or retaliation against the best employees is the least cost effective. *See, e.g., id.* Rather, discrimination and retaliation plaintiffs tend to be those average or below-average workers—equally protected by Title VII, the ADA, the ADEA, the EPA, or the FMLA—for whom plausible rationales for adverse employment actions are readily fabricated by employers with even a meager imagination. *See, e.g., id.* On the other hand, it is also relatively easy for disgruntled former employees to claim a protected basis under federal and state anti-discrimination laws as a reason for their discharge when in fact they played no part.

This is true even when the former employee and/or their counsel believe they did. This is what makes deciding these issues on a paper record daunting.

Consequently, I turn to consider the parties' arguments for and against summary judgment with both the legal standards for summary judgment and the teachings of experience in mind.

## B.  Defamation Claims

In his fourth amended complaint, Pick claims that Cluck, List, Keffeler, Keleher, and Bartolozzi defamed him.[10]  Specifically, Pick asserts that one or more of these defendants made the following defamatory per se statements:

    a.    That Plaintiff Pick stole money out of a former employee's desk.

    b.    That Plaintiff Pick stole money.

    c.    That Plaintiff Pick had taken $3000.00 of missing money.

    d.    That Plaintiff Pick was hiding and altering documents.

Fourth Amended Comp. at ¶ 20.  In addition, Pick alleges that defendants List, Keffeler, and Keleher made statements in reports that "assert and insinuate incompetency by Plaintiff Pick."  Fourth Amended Comp. at ¶ 21.  Specifically, Pick points to the following statements:

    a.    Defendant Keffeler wrote:  "The Board asked Deputy Clerk Keffeler to look into the option of online banking so that someone can monitor the balances on the accounts more closely."

---

[10]Pick also seeks to hold the City responsible for the alleged defamatory actions of its employees, Cluck, List, Keffeler, Keleher, and Bartolozzi.

b.     Defendant Keffeler wrote "She (Keffeler) found in February 2011 a contract signed with DGR to conduct an electric rate study for $13,500, that was to be completed by August 2011. After contacting them she found that they have not been given the information that they had requested to complete the study to date."

c.     Defendant Keffeler wrote, "previous Operations Director Steve Pick did not get him the information that he had requested."

d.     Defendant Keffeler wrote: "Due to the lack of a rate study being performed for at least 20 years."

Fourth Amended Comp. at ¶ 21.

Defendants argue that these statements fail to state a claim for defamation, because all of the identified statements identified in the fourth amended complaint are either true, not defamatory, or privileged.

### 1.    *Applicable law*

Under Iowa law, defamation

"is an impairment of a relational interest; it denigrates the opinion which others in the community have of the plaintiff and invades the plaintiff's interest in his reputation and good name. A cause of action for defamation is based on the transmission of derogatory statements, not any physical or emotional distress to plaintiff which may result. Defamation law protects interests of personality, not of property."

*Kiesau v. Bantz*, 686 N.W.2d 164, 175 (Iowa 2004) (quoting *Schlegel v. Ottumwa Courier*, 585 N.W.2d 217, 221 (Iowa 1998)). As I have previously explained, defamation under Iowa law consists of the "twin torts" of "libel" and "slander," where "libel" is defined as malicious publication, expressed either in printing or in writing, or by signs and pictures, tending to injure the reputation of another person or to expose the person to public hatred, contempt, or ridicule, or to injure the person in the maintenance

of the person's business, and "slander" is defined as oral publication of defamatory material. *McFarland v. McFarland*, 684 F. Supp.2d 1073, 1086 (N.D. Iowa 2010); *Park v. Hill*, 380 F.Supp.2d 1002, 1015 (N.D. Iowa 2005); *Lyons v. Midwest Glazing, L.L.C.*, 235 F.Supp.2d 1030, 1043-44 (N.D. Iowa 2002); *accord Yates v. Iowa West Racing Ass'n*, 721 N.W.2d 762, 768 (Iowa 2006); *Kiesau v. Bantz*, 686 N.W.2d 164, 174 (Iowa 2004); *Barreca v. Nickolas*, 683 N.W.2d 111, 116 (Iowa 2004); *Delaney v. International Union UAW Local No. 94*, 675 N.W.2d 832, 839 (Iowa 2004); *Theisen v. Covenant Med. Ctr., Inc.*, 636 N.W.2d 74, 83 (Iowa 2001); *Johnson v. Nickerson*, 542 N.W.2d 506, 510 (Iowa 1996); *Lara v. Thomas*, 512 N.W.2d 777, 785 (Iowa 1994). In order to establish a prima facie case of defamation, the plaintiff must prove that the defendant "'(1) published a statement that (2) was defamatory (3) of and concerning the plaintiff, and (4) resulted in injury to the plaintiff.'" *Bertrand v. Mullin*, 846 N.W.2d 884, 891 (Iowa 2014) (quoting *Johnson v. Nickerson*, 542 N.W.2d 506, 510 (Iowa 1996)); *Kiesau*, 686 N.W.2d at 175 (same). The Iowa Supreme Court has recognized that:

> There are two kinds of libel: libel per se and libel per quod. In statements that are libelous per se, falsity, malice, and injury are presumed and proof of these elements is not necessary. *Vinson v. Linn-Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 115-16 (Iowa 1985). "An attack on the integrity and moral character of a party is libelous per se." *Wilson v. IBP, Inc.*, 558 N.W.2d 132, 139 (Iowa 1996).

*Kiesau*, 686 N.W.2d at 175. Similarly, the Iowa Supreme Court has recognized that statements may constitute "slander per se." *Barreca*, 683 N.W.2d at 116 (cataloguing Iowa slander per se cases).

The Iowa Supreme Court has long held that "[t]ruth is a complete defense to defamation." *Delaney v. International Union UAW Local No. 94*, 675 N.W.2d 832, 843 (Iowa 2004) (citing *Huegerich v. IBP, Inc.*, 547 N.W.2d 216, 221 (Iowa 1996)); *Marks v. Estate of Hartgerink*, 528 N.W.2d 539, 545 (Iowa 1995); *Hovey v. Iowa State Daily*

*Publ'n, Inc.*, 372 N.W.2d 253, 255 (Iowa 1985); *Cowman v. LaVine*, 234 N.W.2d 114, 125 (Iowa 1975); *Vojak v. Jensen*, 161 N.W.2d 100, 108 (Iowa 1968); *McCuddin v. Dickinson*, 300 N.W. 308, 309 (Iowa 1941); *Children v. Shinn*, 168 Iowa 531, 150 N.W. 864, 869 (1915). Thus, a defamation claim may be defeated by proof that the statements were true. Moreover, the Iowa Supreme Court has recognized substantial truth as a defense in a defamation action. *See Behr v. Meredith Corp.* 414 N.W.2d 339, 342 (Iowa 1987); *Hovey*, 372 N.W.2d at 255-56; *see also Marks*, 528 N.W.2d at 545; *Campbell v. Quad City Times*, 547 N.W.2d 608, 610 (Iowa Ct. App. 1996). Under the substantial truth standard, defendants are not required to establish the literal truth of every detail of the publication, as long as the "sting" or "gist" of the defamatory charge is substantially true. *Hovey*, 372 N.W.2d at 255. As the Iowa Supreme Court has explained:

> The gist or sting of the defamatory charge, according to one court, is "the heart of the matter in question-the hurtfulness of the utterance." *Vachet v. Central Newspapers, Inc.*, 816 F.2d 313, 316 (7th Cir. 1987). We determine the gist or sting by "look[ing] at the highlight of the [publication], the pertinent angle of it, and not to items of secondary importance which are inoffensive details, immaterial to the truth of the defamatory statement." *Id.* (newspaper articles falsely stated plaintiff was arrested on a warrant; method of arrest held immaterial to the truth of defamatory statement that plaintiff was arrested and charged with harboring suspected rapist of an elderly woman).

*Behr*, 414 N.W.2d at 342. With these principles in mind, I turn to defendants' statements under attack to determine whether they are substantially true as a matter of law. I will take up each of defendants' statements seriatim.

## 2. Application of the law

### a. Missing money

#### i. Truth

In his deposition, Pick testified that List was the only defendant to accuse him of stealing money. Pick points to List's statement to then Mayor Bartolozzi that Gesink and Jungers told her that Maass told them that he and Steve Pick found money in Ron Mayer's desk and that Pick took the money from the desk. [11] Considered in the light most

---

[11]In his brief, Pick asserts that Bartolozzi repeated List's statement to Officer Sparr. The summary judgment record, however, does not support that assertion. At best, the record contains a multiple hearsay statement that Maass told Pick that Sparr told Maass that List made this allegation to Bartolozzi. Sparr did not say in his deposition that Bartolozzi repeated List's allegation to him. Rather, Sparr testified:

> A.   I came into City Hall and Craig Bartolozzi, who was not on duty at the time, asked me if I had heard anything about missing funds from a desk from the utility department. And I said, no, I had not. And I believe that he had made the statement that he had received information that there were funds missing from Ron Mayer's desk who used to be head of the utility department.
>
> Q.   And were there concerns conveyed to you that Steve Pick was a suspect?
>
> A.   Not at that time.
>
> Q.   Okay. At a later time how did you learn that Steve Pick was a suspect, if at all?
>
> A.   None.
>
> Q.   Where did Craig receive the information that there was missing funds from Ron Mayer's desk?
>
> A.   He said he had received information.

favorable to Pick, a reasonable fact finder could find that List's statement accused Pick of theft. Under Iowa law, such a statement constitutes slander per se. *See Vinson v. Linn-Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 115-16 (Iowa 1985) (accusing plaintiff of falsifying time cards is libel per se). List, however, contends that her statement was true because she accurately repeated the statement as told to her by Jungers and Gesink. There is a significant flaw in this argument. In order for the truth defense to be applicable here, the factual assertions in List's statement have to be substantially true. Whether List accurately repeated the statement made to her by Gesink and Jungers is irrelevant if Gesink and Jungers's statement about Pick taking money from Mayer's desk was not substantially true. Over 100 years ago, the Iowa Supreme Court clearly rejected such a defense to defamation:

> It is well established that it is no defense in this class of cases to show that the defamatory publication was first made by another person or newspaper, and was simply copied, with proper credit.

*Morse v. Times-Republican Printing Co.*, 100 N.W. 867, 870 (Iowa 1904); *accord Robinson v. Home Fire & Marine Ins. Co.*, 39 N.W.2d 776, 1092 (Iowa 1953) ("Those

---

Q.     From who?

A.     I don't know.

Q.     Have you heard that Paige List thought that Steve Pick had taken money from Ron Mayer's desk?

A.     No.

Sparr Dep. at 19; Plaintiff's App. at 71. Bartolozzi claims that he never talked to Sparr about money being missing from Mayer's desk. Bartolozzi Dep. at 28-29; Defendants' App. At 64-65. Accordingly, I find that the summary judgment record is insufficient as a matter of law to permit a reasonable fact finder to conclude that Bartolozzi repeated List's statement. Defendants' motion for summary judgment is granted as to Pick's defamation claim against Bartolozzi based on his repeating List's allegation.

who repeat slanderous statements make themselves liable therefor and such repetition cannot be considered a necessary or probable consequence of the original slander."); *see also Jones v. Palmer Commc'n, Inc.*, 440 N.W.2d 884, 893 (Iowa 1989) (noting "the common-law rule that republication of a defamatory statement was subject to the same liability as the original statement."), *overruled on other grounds by Schlegel v. Ottumwa Courier,* 585 N.W.2d 217, 224 (Iowa 1998). Indeed, it is basic, hornbook law that "one who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it." RESTATEMENT (SECOND) OF TORTS § 578; *see generally Taj Mahal Travel, Inc. v. Delta Airlines, Inc.*, 164 F.3d 186, 189 (3rd Cir. 1998) (noting that under New Jersey law, "[r]epeating a defamatory statement is itself defamation."); *Schafer v. Time, Inc.*, 142 F.3d 1361, 1368 (11th Cir. 1998) ("A defendant's republication of a libelous statement is a tort under Georgia law, 'independent and separate from the first publication.'"); *Pope V. Chronicle Publ'g Co.*, 95 F.3d 607, 612-13 (7th Cir. 1996) ("Under Illinois law, someone who publishes a defamatory statement made by another remains subject to liability even though the publisher clearly attributes the statement to its source."); *Besett v. Hegg*, 890 F. Supp. 2d 1076, 1091 (D. Minn. 2012) (noting under Minnesota law that "the republication of defamatory words may be the basis of a defamation claim."); *Hart v. Bennet*, 672 N.W.2d 306, 318 (Wis. Ct. App. 2003) ("The law is well settled that it is no justification in an action for libel, that the libelous matter was previously published by a third person, and that the defendant, at the time of his publication, disclosed the name of that person and believed all the statements in the libel to be true."); *Brian v. Richardson*, 87 N.Y.2d 46, 54, 637 N.Y.S.2d 347, 352, 660 N.E.2d 1126, 1131 (1995) ("The fact that a particular accusation originated with a different source does not automatically furnish a license for others to repeat or publish it without regard to its accuracy or defamatory character."). The logic underlying this rule is that it would otherwise be too easy for one "to defame freely by repeating the

defamation of others and defending it as simply an accurate report of what someone else had said." *Gray v. St. Martin's Press, Inc.*, 221 F.3d 243, 250 (1st Cir. 2000) (citing *Cianci v. New Times Publ'g Co.*, 639 F.2d 54, 60–61 (2d Cir. 1980)). Accordingly, under Iowa law, List's repeating Gesink and Jungers's statement subjects her to liability even though she accurately repeated that statement. Thus, this aspect of defendants' motion for summary judgment is denied.

### ii. Qualified privilege

Alternatively, List argues that her statement to then Mayor Bartolozzi about Pick taking money is subject to qualified privilege. List contends that she properly reported the possible theft of money from city property as part of her duties as the City Clerk to Mayor Bartolozzi, the City's chief executive. In response, Pick argues that summary judgment is inappropriate on the issue of List's qualified privilege because he has generated a genuine issue of material fact over whether List's statement about him was made in food faith.

Under Iowa law, "[q]ualified privilege is an affirmative defense in a defamation action." *Jones v. University of Iowa*, 836 N.W.2d 127, 149 (Iowa 2013); *Barreca v. Nickolas*, 683 N.W.2d 111, 116–17 (Iowa 2004). In order to demonstrate the existence of qualified privilege in an action for defamation a defendant must prove:

> "(1) the statement was made in good faith, (2) the defendant had an interest to uphold, (3) the scope of the statement was limited to the identified interest, and (4) the statement was published on a proper occasion, in a proper manner, and to proper parties only."

*Jones*, 836 N.W.2d at 149 (quoting *Theisen v. Covenant Med. Ctr., Inc.*, 636 N.W.2d 74, 84 (Iowa 2001)). The privilege must not be abused or exceeded. *See id.* ("The privilege may be lost 'if the speaker acts with actual malice, or exceeds or abuses the privilege through, for example, excessive publication or through publication to persons

other than those who have a legitimate interest in the subject of the statements.'") (quoting *Theisen*, 636 N.W.2d at 84); *see also Lara v. Thomas*, 512 N.W.2d 777, 786 (Iowa 1994). Generally, it is the "court's responsibility to determine whether a defendant's statement is qualifiedly privileged, and a jury question as to whether the privilege was abused." *Jones*, 836 N.W.2d at 149; *see Barreca*, 683 N.W.2d at 118. So long as good faith is present,

> "the person making the statement is not limited to facts that are within his personal knowledge, but may, and should, pass on to his inquirer all relevant information that has come to him, regardless of whether he believes it to be true or not. But of course, any such communication is actionable if made maliciously."

*Haldeman v. Total Petroleum, Inc.*, 376 N.W.2d 98, 104 (Iowa 1985) (quoting 50 Am. Jur.2d *Libel & Slander* § 273, at 791 (1970)).

Pick contends that he has generated a genuine issue of material fact as to whether List's statement was made in good faith, and, thus, whether the defense of qualified privilege applies here. Pick points to List's rocky relationship with him and the fact that she testified that she was "appalled" and "upset" by Pick's publishing minutes in the local newspaper that stated that the Utilities Director had asked that the Clerk get reports to him in a more timely fashion. Pick also points out that List viewed his action as a public attack on her. I have found no Iowa appellate decision addressing the meaning of good faith in the context of a qualified privilege. *See Godfredson v. Lutheran Bhd.*, Nos. 0-431, 99-1712, 2000 WL 1675869, at *5 n.4 (Iowa Ct. App. Nov. 8, 2000) (noting that the court could not locate any "Iowa authority addressing the meaning of good faith in the context of a qualified privilege."). Under Iowa law, "good faith," "'has various meanings; sometimes it is viewed objectively and at other times, subjectively.'" *City of Riverdale v. Diercks*, 806 N.W.2d 643, 656 (Iowa 2011) (quoting *Sieg Co. v. Kelly*, 568

N.W.2d 794, 804 (Iowa 1997)). The Iowa Supreme Court has defined "good faith" subjectively to mean "honest motive."[12] *Diercks*, 806 N.W.2d at 656.

Taking every inference in the summary judgment record in the light most favorable to Pick, as I must, *see Torgerson*, 643 F.3d at 1042, I conclude that no genuine issue of material fact exists about List's good faith in making the statement. List testified that she "had to tell someone" about Gesink and Jungers's statement because she had been told by a former city employee that a city employee's failure to report the theft of city money by another employee made the non-reporting employee "just as guilty because you knew about it and you didn't tell." List Dep. at 25-26; Defendants' App. at 43-44. Although Pick points to List's reaction to his publishing of the minutes as a possible motivating factor for her to act in bad faith in reporting Gesink and Jungers's statement, his posting of the minutes occurred in July 2011, four months before List's statement. There is no evidence in the summary judgment record that List was still upset over Pick's action at the time List made the statement. Several other circumstances support the conclusion that List made the statement in good faith. First, she initially told the account to Bartolozzi in the form of a hypothetical, without mentioning any names. Only after Bartolozzi questioned her about the account, did List relate the account as originally told by Gesink and Jungers. Relating the account as a hypothetical makes no sense if List's motive was to besmirch Pick's character. Additionally, there is no evidence in the summary judgment record that List related Gesink and Jungers's statement to anyone other than Bartolozzi. Again, if List's motive was to besmirch Pick's character, she

---

[12]In comparison, the Iowa Supreme Court held that "good-faith belief" was measured by an objective test in the context of an unemployment compensation claim. *Aalbers v. Iowa Dep't of Job Serv.*, 431 N.W.2d 330, 335–36 (Iowa 1988). In the absence of any persuasive authority, I find that the test for good faith in the context of qualified privilege is subjective.

certainly could have repeated Gesink and Jungers's statement to any number of individuals. On this record, a juror would be unreasonable in concluding that List acted in bad faith in reporting a possible theft of city property to the mayor. Thus, List has established her entitlement to summary judgment on Pick's defamation claim and this portion of defendants' motion for summary judgment is granted.

### b.    Hiding or altering documents

Defendants further seek summary judgment on Pick's defamation claim based on Keleher's January 25, 2012, email in which she alluded to Pick's hiding or altering documents. On January 25, 2012, Keleher sent an email to newly elected Mayor Cluck. In that email, Keleher wrote, in part:

> I believe Craig was going to Steve [Pick] and also have documents secured to prevent alteration or absconding with them even if Steve was going in after hours. Craig was going to direct Steve that he is not allowed in the office while on leave. Craig will take the lead on getting the audit secured . . . not Steve, and get it started asap. If there is wrong doing, it will all break loose, no matter if Steve is hiding or altering documents.

Keleher Email at 1; Defendants' App. at 73 (ellipsis in original). Mayor Cluck forwarded Keleher's email to List and Keffeler. Defendants contend that Keleher's email, viewed in the context in which it was made, is not defamatory as a matter of law because Keleher prefaced her statement with "if." Pick contests defendants' assertion and argues that Keleher's email was defamatory per se because it accused him of hiding or altering documents and thus attacked his honesty and integrity since he was in charge of the Utility accounts.

Although the parties dispute whether Keleher's email, standing alone, constitutes defamation per se, it is well established, under Iowa law, that in determining whether a slander per se claim should be submitted to the jury, the court "need only decide whether

the statement could reasonably be understood as slanderous per se." *Wilson v. IBP, Inc.*, 558 N.W.2d 132, 140 (Iowa 1996) (citing *Vinson v. Linn–Mar Community Sch. Dist.*, 360 N.W.2d 108, 116 (Iowa 1984)); *see also Kelly v. Iowa State Educ. Ass'n*, 372 N.W.2d 288, 295 (Iowa Ct. App. 1985) (rejecting defendants' argument that "writings cannot be libelous per se because no derogatory meaning is present in the statements themselves [and that] such meaning only arises by inference"). The determinative rule is: "If the language is capable of two meanings including the one ascribed by the complainant, it is for the jury to say whether such meaning was the one conveyed." *Vinson*, 360 N.W.2d at 116 (citing *Berger v. Freeman Tribune Publ. Co.*, 132 Iowa 290, 109 N.W. 784, 786 (1906)). Viewed in the light most favorable to Pick, as the non-moving party, I find that Pick has not generated a genuine issue of material fact that Keleher's comments could reasonably be understood to impugn Pick's integrity or moral character and thus be defamatory per se. Keleher prefaced her comments with the qualifying word "if." This qualifying word is critical in determining whether Keleher's statement is susceptible to a defamatory construction. As used, the word "if" is a conjunction that means "in the event that." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 576 (10th ed. 1995). Because her comment is couched in the conditional term "if," it cannot be reasonably viewed as declaring or implying a provably false factual assertion about Pick. Accordingly, Keleher's statement does not accuse Pick of anything and is incapable of defamatory construction. Thus, this segment of defendants' motion for summary judgment is granted.

### c. *Other defamation allegations*

Defendants also seek summary judgment on Pick's remaining defamation claims based on the statements about online banking and the rate study. Defendants contend that these statements were not defamatory as a matter of law. Defendants also argue that the rate study statement was true. Pick has not resisted these portions of defendants' motion

for summary judgment. Accordingly, defendants' motion for summary judgment is granted with respect to Pick's claims of defamation based on the online banking and the rate study statements.

## C. *Section 1983 Claims*

Defendants also seek summary judgment on Pick's claims that defendants violated his Fourth and Fourteenth Amendment rights against unreasonable search and seizure, pursuant to 42 U.S.C. § 1983.[13] Although Pick alleges that "all defendants acted together" in depriving him of his Fourth and Fourteenth Amendment rights, *see* Fourth Amended Compl. at ¶ 35, he only specifically alleges that Cluck, Rollins, and Bartolozzi were actively involved in the search or seizure of either him or his property. Pick also

---

[13] Section 1983 was designed to provide a "broad remedy for violations of federally protected civil rights," *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 685 (1978), but it provides no substantive rights. *Albright v. Oliver*, 510 U.S. 266, 271 (1994); *Graham v. Conner*, 490 U.S. 386, 393–94 (1989). To put it another way, 42 U.S.C. § 1983 provides a remedy for violations of all "rights, privileges, or immunities secured by the Constitution and laws [of the United States]." 42 U.S.C. § 1983; *see also Albright*, 510 U.S. at 271 (42 U.S.C. § 1983 "merely provides a method for vindicating federal rights elsewhere conferred."); *Graham*, 490 U.S. at 393–94 (same); *Maine v. Thiboutot*, 448 U .S. 1, 4 (1980) ("Constitution and laws" means 42 U.S.C. § 1983 provides remedies for violations of rights created by federal statute, as well as those created by the Constitution.). To state a claim pursuant to 42 U.S.C. § 1983, a plaintiff must establish the following: (1) the violation of a right secured by the Constitution or laws of the United States, and (2) the alleged deprivation of that right was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). *See generally Kimbrough v. Fort Dodge Correctional Facility*, No. C13–3005–MWB, 2013 WL 4670277, *3 (N.D. Iowa Aug. 30, 2013); *Schon v. Schumacher*, No. C13–4049–MWB, 2013 WL 3479417, *3 (N.D. Iowa July 11, 2013).

makes a claim for municipal liability against the City. I will take up each of these claims in turn.

### 1.  *Claim against Bartolozzi*

Bartolozzi asserts that Pick makes no allegations that he searched or seized either him or his property. Pick concedes that he has no viable claim against Bartolozzi for a Fourth Amendment violation concerning the search of his trail camera, or a search of his desk or computer. Accordingly, defendants' motion for summary judgment is granted with respect to Pick's § 1983 claim against Bartolozzi.

### 2.  *Claims against Rollins and Cluck*

Pick alleges that Rollins and Cluck violated his Fourth Amendment rights by removing Pick's trail camera from his office. At some point, Pick placed a trail camera in his office because he thought someone was stealing things from his desk. List discovered the camera.[14] List called Cluck, the Mayor, and reported what she had found. Cluck, in turn, ordered Rollins, the Chief of Police, to remove the camera. On January 3, 2012, Rollins removed Pick's trail camera from Pick's office. He removed the memory card, shut the camera off, and placed everything in a bag. Rollins later stored the bag in an evidence closet at the Remsen Police Department. When Pick learned about the removal of his camera, he asked Rollins to return it. Rollins refused until he was given clearance by Cluck and/or the City Attorney. Only after Pick had his nephew, an attorney, write a letter to the City demanding the return of the trail camera was it returned by Rollins. Rollins and Cluck argue that their actions do not constitute a Fourth

---

[14]The summary judgment record does not reveal what List was doing when she came upon Pick's trail camera.

Amendment violation because the search and seizure satisfied the reasonableness standard set out in *O'Connor v. Ortega*, 480 U.S. 709 (1987).[15]

The Fourth Amendment protects the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. CONST. amend. IV. In the employment context, a plurality of the United States Supreme Court in *O'Connor* rejected the contention that "public employees can never have a reasonable expectation of privacy in their place of work," and set out a two-step framework for considering Fourth Amendment claims against government employers. *See O'Connor*, 480 U.S. at 717–19. First, a reviewing court must consider "[t]he operational realities of the workplace" in order to determine "whether an employee has a reasonable expectation of privacy" there. *Id*. at 717. This determination is made on "a case-by-case basis." *Id*. at 718. The Court explained that public employees' expectation of privacy in their offices, desks, file cabinets and the like may be reduced by virtue of actual office practices and procedures, or by legitimate regulation.[16] *Id*. at

---

[15] In his response, Pick does not discuss *O'Connor* or its progeny but, instead, cites the United States Supreme Court's decision in *United States v. Place*, 462 U.S. 696 (1983). In *Place*, the Supreme Court held that the "canine sniff" of a drug-sniffing dog does "not constitute a 'search' within the meaning of the Fourth Amendment." *Id*. at 707. The case arose when law enforcement officers seized the luggage of an airline passenger in order to permit a drug dog to sniff it. *Id*. at 699. The drug dog alerted, indicating the possible presence of drugs in the luggage, and the officers obtained a search warrant. The officers subsequently searched the bags and found a large quantity of cocaine. *Id*. While recognizing that a person has a reasonable expectation of privacy in the contents of his or her luggage, the Supreme Court held that the dog's sniff test was not a Fourth Amendment search and emphasized the unique nature of the investigative technique, which could disclose only criminal activity. *Id*. at 707. Here, of course, the search of Pick's office did not involve a drug dog or a canine of any sort.

[16] Justice Scalia's concurrence reached the same result but by a different route.

717. Next, where an employee has a legitimate privacy expectation, an employer's intrusion on that expectation "for noninvestigatory, work-related purposes, as well as for investigations of work-related misconduct, should be judged by the standard of reasonableness under all the circumstances."[17] *Id*. at 725–726.

Under *O'Connor*, I must first consider the question of whether Pick had a reasonable expectation of privacy in his office. Pick, however, has not addressed this part of the *O'Connor* test. To prevail on his Fourth Amendment claim, Pick must show that, based on the "operational realities of the workplace," he had a reasonable expectation of privacy in his office. *See O'Connor*, 480 U.S. at 715. The Court in *O'Connor* recognized that a government employee's office could be "so open to fellow employees or the public that no expectation of privacy [would be] reasonable." *O'Connor*, 480 U.S. at 717–18. When Pick left for vacation, he left the door to his office open, his computer on, and his desk unlocked. In the past, when other employees needed something on or in Pick's desk, and he was not in his office, they felt free to go and get it themselves. Pick never told anyone to stay out of his office if he was not there, and the summary judgment record is devoid of any evidence indicating that Pick had authority to limit access to his office. On this record, I find that Pick has not generated

---

Justice Scalia would find that the Fourth Amendment categorically governs the government workplace. *Id*. at 731. However, in his view, many government office searches would survive Fourth Amendment scrutiny because he "would hold that government searches to retrieve work-related materials or to investigate violations of workplace rules—searches of the sort that are regarded as reasonable and normal in the private-employer context—do not violate the Fourth Amendment." *Id*. at 732.

[17] Although the general rule is that a search of private property without consent is unreasonable unless it is accompanied by a warrant, *see O'Connor*, 480 U.S. at 720 (citing *Mancusi v. DeForte*, 392 U.S. 364, 370 (1968); *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 528–529 (1967)), in the workplace context, work-related searches do not require a warrant. *O'Connor*, 480 U.S. at 722.

a genuine issue of material fact that he had a reasonable expectation of privacy in his office. Consequently, Rollins's search did not violate his Fourth Amendment rights.

This leaves the related issue of whether Pick's trail camera was seized. Defendants contend that there was no seizure, because Pick was on vacation when the trail camera was removed from his office and, thus, there was no interference with his possessory interests in the trail camera. Pick counters that, while it is true that he was on vacation when the trail camera was removed, Rollins refused to return the trial camera upon his return. Rollins did not return the trail camera to Pick until Pick had his nephew, an attorney, write a letter to the City demanding its return. Pick contends that the detention of his trail camera for at least 8 days constituted an illegal seizure.

The United States Supreme Court defines the seizure of property as "'some meaningful interference with an individual's possessory interests in that property.'" *Soldad v. Cook County, Ill.*, 506 U.S. 56, 62 (1992) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)); *Maryland v. Macon*, 472 U.S. 463, 469 (1985) (same); *United States v. Smith*, 715 F.3d 1110, 1116 (8th Cir. 2013) (same); *United States v. Clutter*, 674 F.3d 980, 984 (8th Cir. 2012) (same); *see Burlison v. Springfield Pub. Schs.*, 708 F.3d 1034, 1039 (8th Cir. 2013); *Beaulieu v. Ludeman*, 690 F.3d 1017, 1034 (8th Cir. 2012). Here, I conclude that the eight days Pick's trail camera was retained after he returned from vacation does not rise to a violation of Pick's Fourth Amendment rights. Pick's camera was returned and any damage resulting from the amount of time it was retained is *de minimis*. *See Verri v. Nanna*, 972 F. Supp. 773, 797 (S.D.N.Y. 1997) (holding that plaintiff did not suffer a constitutional violation where village police chief's three month delay in returning book to plaintiff resulted in only *de minimis* damages). Thus, there was no "meaningful interference" with Pick's possessory interests in his trail camera and no "seizure" within the meaning of the Fourth Amendment. Accordingly, this portion of defendants' motion for summary judgment is granted.

### 3.    *Claim against the City*

Defendants also seek summary judgment on Pick's claim against the City under § 1983 for Rollins's actions.  Defendants argue that Pick's claim fails as a matter of law because the City cannot be held liable for Rollins's actions based on respondeat superior.[18]  Pick contends that he is not seeking to impose respondeat superior liability on the City, but argues that the City is liable because it failed to train Rollins and that Rollins was a policy-maker for the City.

The Eighth Circuit Court of Appeals has succinctly described the requirements for "*Monell* liability" of a municipality, as follows:

> Although the Supreme Court has "held that a municipality is a 'person' that can be liable under § 1983," it is well established "that a municipality cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor." *Szabla v. City of Brooklyn Park, Minn.*, 486 F.3d 385, 389 (8th Cir. 2007) (citing *Monell [v. Department of Social Servs. of New York]*, 436 U.S. [658,] 690–91, 98 S. Ct. 2018 [(1978)]).  Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an "official municipal policy," *Monell*, 436 U.S. at 691, 98 S. Ct. 2018; (2) an unofficial "custom," *id.* at 690–91, 98 S. Ct. 2018; or (3) a deliberately indifferent failure to train or supervise, *see City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed.2d 412 (1989).

_____

[18] As defendants correctly point out, it is well established that "[s]ection 1983 will not support a claim based on a respondeat superior theory of liability."  *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981) (citing *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978)); *see City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) ("Respondeat superior or vicarious liability will not attach under § 1983."); *Luckert v. Dodge Cnty.*, 684 F.3d 808, 817 (8th Cir. 2012) (holding prison supervisors were not liable under § 1983 on respondeat superior theory); *Brown v. Fortner*, 518 F.3d 552, 559 n.1 (8th Cir. 2008) (noting that § 1983 claims cannot be based on respondeat superior or vicarious liability).

41

*Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013). Thus, to prevail on his failure to train claim, Pick must establish an underlying violation of his constitutional rights. *See Olinger v. Larson*, 134 F.3d 1362, 1367 (8th Cir. 1998). As discussed above, Pick fails to establish any genuine issue of material fact about whether such a violation occurred. Therefore, the City is entitled to summary judgment on Count 5.

### D.     Intentional Infliction Of Emotional Distress Claims

Defendants also seek summary judgment on Pick's intentional infliction of emotional distress claims to the extent that those claims are based on the same alleged discriminatory conduct that forms the basis for his claims of unlawful age and disability discrimination under the Iowa Civil Rights Act, Iowa Code Chapter 216. Defendants argue that the Iowa Civil Rights Act preempts Pick's intentional infliction of emotional distress claims to the extent Pick relies on the same discriminatory acts alleged in support of his claims of unlawful discrimination under that act. Defendants point out that in *Chester v. Northwest Iowa Youth Emergency Servs. Ctr.*, 869 F. Supp. 700, 712–13 (N.D. Iowa 1994), I held that the Iowa Civil Rights Act preempted plaintiff's intentional infliction of emotional distress claim against her former supervisor and employer where the same facts alleged in support of plaintiff's claims of sexual harassment were incorporated in her claim of intentional infliction of emotional distress. Pick does not contest this conclusion, but argues that he does not base his claims of intentional infliction of emotional distress solely on allegedly discriminatory conduct. To the extent that Pick's claims of intentional infliction of emotional distress are based on discriminatory conduct, Iowa Code Ch. 216 provides the exclusive remedy. *See id*. However, Pick alleges that these claims are not based solely on allegedly discriminatory conduct, but also upon

allegedly defamatory and retaliatory actions, that is or may be wrongful entirely independently of whether it is also discriminatory. *See Greenland v. Fairtron Corp.*, 500 N.W.2d 36, 38-39 (Iowa 1993) (holding that claims of assault and battery were not "preempted" by Iowa Code Ch. 216, because, "[u]nlike the claim for intentional infliction of emotional distress, Greenland's claims for assault and for battery are not bound up in her discrimination complaints."). Defendants do not contest this assertion.

Consequently, defendants are entitled to summary judgment on Pick's claims of intentional infliction of emotional distress, at this point, only to the extent that those claims are based on acts of age and disability discrimination for which the claims in Counts V and VI provide Pick's exclusive remedies.

### E.    Wrongful Termination In Violation Of Employee Manual

Defendants next seek summary judgment on Pick's claim that he was wrongfully terminated in violation of the terms of the Manual.   In Count IV of the fourth amended complaint, Pick asserts that defendants violated the Manual's equal opportunity provision by discriminating against him based on his age and disability.[19]   Defendants argue that

---

[19] As noted above, the Manual's "Equal Employment Opportunity" provision provides:

> No appointment to or termination from a position with the City of Remsen or the Remsen Municipal Utilities shall be affected or influenced in any manner by any consideration of race, creed, sex, age, national origin, political opinion, or handicap.  All persons shall have equal access to positions, limited only by their ability to do the work.  Promotions, advancement, and training opportunities will be awarded without regard to any of the factors outlined above.

The Manual at 2; Defendants' App. at 110.

this claim is also preempted by the Iowa Civil Rights Act because Pick relies on the same discriminatory acts to support this claim as he does to support his claims of unlawful discrimination. Because Pick's claim for wrongful termination in violation of the Manual's terms is based on precisely the same allegedly discriminatory conduct that forms the basis for his unlawful discrimination claims, Iowa Code Ch. 216 provides the exclusive remedy, preempting this claim. *See Chester*, 869 F. Supp. at 712–13. Accordingly, this portion of defendants' motion for summary judgment is granted.

## F.     *Disability Discrimination Claims*

I turn next to consider the viability of Pick's disability discrimination claims. The ADA—including changes made in the ADA Amendments Act of 2008 ("ADAAA")—prohibits an employer from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[20]   42 U.S.C. § 12112(a); *Tusing v. Des Moines Indep. Community Sch. Dist.*, 639 F.3d 507, 518 (8th Cir. 2011). The prohibition on disability discrimination in the ICRA, Iowa Code Ch. 216, is similar to the prohibition in the ADA:

> It shall be an unfair or discriminatory practice for any . . .
> [p]erson to refuse to hire, accept, register, classify, or refer
> for employment, to discharge any employee, or to otherwise
> discriminate in employment against any applicant for
> employment or any employee because of the . . . disability of

---

[20] "The amendments broadened the definition of what constitutes a disability and rejected the strict standards the Supreme Court set forth in *Toyota [ Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 122 S. Ct. 681, 151 L.Ed.2d 615 (2002) ]." *Nyrop v. Independent Sch. Dist. No. 11*, 616 F.3d 728, 734 n.4 (8th Cir. 2010). Although I recognize that the ADA has been partially amended by the ADAAA, for simplicity, I will refer only to the ADA. I will, however, incorporate the amendments in my analysis where applicable.

such applicant or employee, unless based upon the nature of
the occupation.

IOWA CODE § 216.6(1)(a).

The Eighth Circuit Court of Appeals and the Iowa Supreme Court have both found that "ADA and ICRA disability claims are analyzed under the same standards." *Tjernagel v. Gates Corp.*, 533 F.3d 666, 671 (8th Cir.2008)); a*ccord Kallail v. Alliant Energy Corporate Servs., Inc.*, 691 F3d 925, 930 (8th Cir. 2012) ("'[D]isability claims under the ICRA are generally analyzed in accord with the ADA.'") (quoting *Gretillat v. Care Initiatives*, 481 F.3d 649, 652 (8th Cir.2007)); *Diaz v. Tyson Fresh Meats, Inc.*, 643 F.3d 1149, 1151 (8th Cir. 2011) ("We analyze Diaz's retaliation claim like an ADA-retaliation claim because an Iowa court would do so."); *see Tusing*, 639 F.3d at 517–18; *Nuzum v. Ozark Auto. Distribs., Inc.*, 432 F.3d 839, 842 n. 2 (8th Cir. 2005); *Schlitzer v. University of Iowa Hosps. & Clinics*, 641 N.W.2d 525, 529 (Iowa 2002) ("The common goals of the Federal ADA and our civil rights act have encouraged us to look to the federal statutory and regulatory standards in applying our statute"); *Bearshield v. John Morrell & Co.*, 570 N.W.2d 915, 918 (Iowa 1997) ("Given the common purposes of the ADA and the ICRA's prohibition of disability discrimination, as well as the similarity in the terminology of these statutes, we will look to the ADA and underlying federal regulations in developing standards under the ICRA for disability discrimination claims."). Consequently, my discussion of Pick's "disability" claims applies equally to his claims under the ADA and the ICRA.

### 1.    *The analytical framework*

Pick can defeat defendants' motion for summary judgment on his disability discrimination claims by either: (1) presenting proof of direct evidence of discrimination; or (2) "creating the requisite inference of unlawful discrimination" under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

802–04 (1973). [21]  *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004); *accord Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1020 (8th Cir. 2011).  Under the *McDonnell Douglas* framework, Pick has the initial burden of establishing a prima facie case of disability discrimination.  *Rehrs v. Iams Co.*, 486 F.3d 353, 356 (8th Cir. 2007); *Pye*, 641 F.3d at 1021.  If Pick establishes a prima facie case, "[t]he burden then shifts to [defendants] to articulate some legitimate, nondiscriminatory reason for [its] actions." *Rehrs*, 486 F.3d at 356; *accord Pye*, 641 F.3d at 1021.  "If [defendants] articulate such a reason, the burden returns to [Pick] to show that [defendants'] justification is a pretext." *Rehrs*, 486 F.3d at 356; *accord Pye*, 641 F.3d at 1021.

### 2.    *Prima facie case*

To establish a prima facie case of disability discrimination, Pick must show that he:

> "(1) is disabled within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) has suffered an adverse employment action because of [his] disability." [*Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013)]; *Young v. Warner–Jenkinson Co.*, 152 F.3d 1018, 1021 (8th Cir. 1998). Once the plaintiff establishes this prima facie case, then a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action. *Young*, 152 F.3d at 1021. If such reason is provided, the burden shifts back to the plaintiff to show that the employer's

---

[21]Direct evidence of discrimination is "evidence 'showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' " the adverse employment action.  *Griffith*, 387 F.3d at 736 (quoting *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 65–66 (8th Cir. 1997)). Direct evidence "most often comprises remarks by decisionmakers that reflect, without inference, a discriminatory bias." *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 861 (8th Cir. 2009). Pick concedes that he has no direct evidence of disability discrimination.

> proffered reason is merely a pretext for intentional discrimination. *Id.*

*E.E.O.C. v. Product Fabricators, Inc.*, --- F. 3d. ---, 2014 WL 3971477, at *3 (8th Cir. Aug. 15, 2014); see *Olsen v. Capital Region Med. Ctr.*, 713 F.3d 1149, 1153–54 (8th Cir. 2013) (concluding that to establish a prima facie case of discrimination under the ADA, a plaintiff must show that "'(1) he is disabled; (2) he is qualified to perform the essential functions of his job, with or without accommodation; and (3) he suffered an adverse employment action under circumstances from which an inference of unlawful discrimination' could be inferred.'") (quoting *Young v. Warner–Jenkinson Co.*, 152 F.3d 1018, 1021–22 (8th Cir. 1998)). The defendants challenge Pick's ability to generate a genuine issue of material fact on the first element of his prima facie case, "disability."

### a.    *Disability*

As relevant to Pick's claim, the ADA defines an individual with a disability as someone who: (1) has a physical or mental impairment that substantially limits one or more of the individual's major life activities; or (2) has a record of the impairment. 42 U.S.C. § 12102(1)(A)-(B); 29 C.F.R. § 1630.2(g)(1)-(ii) (defining disability under the ADA as "[a] physical or mental impairment that substantially limits one or more of the major life activities of such individual," or "[a] record of such an impairment."). "An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability." 42 U.S.C. § 12102(4)(C). According to regulations promulgated by the EEOC after the ADAAA's passage,

> An impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.

29 C.F.R. § 1630.2(j)(1)(ii). Determining whether an impairment is substantially limiting "requires an individualized assessment." 29 C.F.R. § 1630.2(j)(1)(iv). "Major life activities" include "sleeping, . . . concentrating, thinking, . . . and working." 42 U.S.C. § 12102(2). Pick alleges that his depression qualifies as a disability. Defendants argue that Pick fails to meet this definition of disability because his mental condition does not limit him from any major life activity. Pick counters that his mental impairment substantially limits his ability to sleep and work.

Pick's strongest evidence of disability in the summary judgment record relates to his impaired ability to work. Over a six month span, Pick was seen repeatedly by Kosters and Gillette and treated for stress, anxiety, and depression. Both Kosters and Gillette repeatedly prescribed that Pick not work due to his mental condition. In amending the ADA, Congress overturned then-existing precedent and instructed courts to construe the definition of disability "in favor of broad coverage of individuals." 42 U.S.C. § 12102(4)(A); *see Tusing*, 639 F.3d at 518 n. 5 (recognizing that ADAAA amendments "broadened the definition of a disability."); *Nyrop v. Independent Sch. Dist. No. 11*, 616 F.3d 728, 734 n. 4 (8th Cir. 2010) (noting that the 2008 amendments "broadened the definition of what constitutes a disability."); 29 C.F.R. § 1630.2(j)(1) (An individual's impairment need not "prevent" or "significantly or severely restrict" a major life activity to qualify as a disability.).

Under the ADAAA's more liberal definition, I conclude that Pick's repeated inability to work due to his mental condition could qualify as a "substantial" limitation. Moreover, there is some evidence in the record that Pick suffers from insomnia and has difficulties concentrating. Although the record of these limitations is limited, I find that the evidence of Pick's mental condition, overall, is sufficient to generate a genuine issue of material fact regarding his alleged disability. *See e.g., Fenney v. Dakota, Minn. & E.R. Co.*, 327 F.3d 707, 716 (8th Cir. 2003) (reversing summary judgment where

plaintiff provided sufficient evidence of disability to create "a reasonable inference from which an issue of material fact can be drawn").

### b.    Other requirements

Neither party has addressed the second and third requirements for a prima facie case of disability discrimination, that Pick is a qualified individual under the ADA and that he suffered an adverse employment action under circumstances from which an inference of unlawful discrimination arises.  I assume from this that defendants concede that these factors are established for the purposes of summary judgment.

### 3.    Nondiscriminatory reason for action

Because Pick has, for the purposes of summary judgment, established his prima facie case, a rebuttable presumption of discrimination arises, and the burden shifts to defendants to articulate a legitimate nondiscriminatory reason for the adverse employment action.  *See Product Fabricators, Inc.*, --- F. 3d. ---, 2014 WL 3971477, at *3.  Here, defendants have done so.  They contend that Pick's position was eliminated for legitimate business reasons, namely, that the Utility Board determined that the Utility did not need an expensive operations director.

### 4.    Showing of pretext

Since defendants have articulated a legitimate nondiscriminatory reason for the adverse employment action, the burden shifts back to Pick to show that defendants' proffered reason is merely a pretext for intentional discrimination.  *See Product Fabricators, Inc.*, --- F. 3d. ---, 2014 WL 3971477, at *3.  The Eighth Circuit Court of Appeals has explained what a plaintiff must do to show that a proffered justification is a pretext for disability discrimination, as follows:

> "'To demonstrate pretext, a plaintiff must present sufficient evidence to demonstrate both that the employer's articulated reason for the adverse employment action was false and that discrimination was the real reason. . . . [T]he plaintiff must

> do more than simply create a factual dispute as to the issue of
> pretext; he must offer sufficient evidence for a reasonable
> trier of fact to infer discrimination.'" *McNary v. Schreiber
> Foods, Inc.*, 535 F.3d 765, 769 (8th Cir.2008) (quoting
> *Wilking v. County of Ramsey*, 153 F.3d 869, 874 (8th Cir.
> 1998)).

*Lors v. Dean*, 595 F.3d 831, 834 (8th Cir. 2010). More specifically, the plaintiff "'must demonstrate that a discriminatory animus lies behind the defendants' neutral explanations.'" *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 769 (8th Cir.2008) (quoting *Wilking v. County of Ramsey*, 153 F.3d 869, 874 (8th Cir. 1998) (internal quotations and citations omitted). Thus, "'[t]o prove pretext, the employee must do more than show that the employment action was ill-advised or unwise, but rather must show that the employer has offered a "phony excuse."'" *Id.* (quoting *Henderson v. Ford Motor Co.*, 403 F.3d 1026, 1034 (8th Cir. 2005) (internal citation omitted).

Viewing the record in the light most favorable to Pick in accordance with summary judgment standards, I find that Pick has generated a genuine issue of material fact as to whether defendants' stated reason for eliminating the operations director position was pretextual. As Pick points out, in their response to the Iowa Civil Rights Commission complaint, defendants stated: "In the end, Steven Pick's own behavior led the Board to ask whether it needed a Utility Operations Director. After more than six months of study and inquiry, it became clear that the answer was 'no'". Plaintiff's App. at 115. Bartolozzi signed a sworn affidavit attesting to the truth of the response to the Iowa Civil Rights Commission complaint. Douvia and Bartolozzi, however, both testified in their depositions that the Utility Board did not engage in any studies to determine if Pick's position was needed. Similarly, Keleher testified that the only research or study she did on the issue of reorganizing the Utility Department was just "trying to understand what everybody was doing." Keleher Dep. at 17; Plaintiff's App. at 46. I conclude that this evidence represents "fundamentally different justifications for an employer's action

[which] would give rise to a genuine issue of fact with respect to pretext since they suggest the possibility that neither of the official reasons was the true reason." *Washington v. Garrett*, 10 F.3d 1421, 1434 (9th Cir. 1993). Therefore, defendants are not entitled to summary judgment on Pick's disability discrimination claim because he has generated genuine issues of material fact that the proffered reasons for his termination are a pretext for disability discrimination. Accordingly, this portion of defendants' motion for summary judgment is denied.

## G. Age Discrimination Claims

I will next address Pick's claim that defendants discriminated against him based on his age. The ADEA makes it unlawful for an employer to discriminate against an individual because of the individual's age. 29 U.S.C. § 623(a)(1). Similarly, the ICRA makes it unlawful to discriminate against any employee because of the employee's age. IOWA CODE § 216.6(1)(a). A court generally applies the same analysis to age discrimination claims under the ADEA and the ICRA, with one exception: the standard of proof required. *Tusing*, 639 F.3d at 514. In *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), the United States Supreme Court held that "a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Id.* at 180. In an action brought pursuant to the ICRA, however, the plaintiff need only prove that age was "a motivating factor" in the employer's decision. *Newberry v. Burlington Basket Co.*, 622 F.3d 979, 981–83 (8th Cir. 2010) (citing *DeBoom v. Raining Rose, Inc.*, 772 N.W.2d 1, 11–14 (Iowa 2009)).

### 1. The analytical framework

A claim of age discrimination may be established either through direct evidence of discrimination or through circumstantial evidence. *Fitzgerald v. Action, Inc.*, 521

F.3d 867, 876 (8th Cir. 2008) (citing *Carraher v. Target Corp.*, 503 F.3d 714, 716 (8th Cir. 2007)); *see also Loeb v. Best Buy Co., Inc.*, 537 F.3d 867, 872 (8th Cir. 2008) ("To establish a claim of intentional age discrimination, a plaintiff may present direct evidence of such discrimination or may prove his claim through circumstantial evidence."). If there is no direct evidence of age discrimination, then the plaintiff's claims are analyzed under the *McDonnell Douglas* burden-shifting scheme.[22] Under the first step of the *McDonnell Douglas* test, the plaintiff has the burden of establishing a prima facie case of age discrimination. *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1083 (8th Cir. 2013). A prima facie case creates a presumption that the employer unlawfully discriminated against the plaintiff and shifts the burden to the employer to articulate a legitimate nondiscriminatory reason for its actions. *Id.* If the employer meets this burden, then the presumption of discrimination dissolves and the burden returns to the plaintiff to demonstrate that the proffered reason is a mere pretext for age discrimination. *Id.*

---

[22] In *Tusing*, the Eighth Circuit Court of Appeals pointed out that the Supreme Court had not "'definitively decided whether the evidentiary framework of *McDonnell Douglas* is appropriate in the ADEA context.'" *Tusing*, 639 F.3d at 515 n. 3 (quoting *Gross*, 557 U.S. at 175 n.2). Nonetheless, the Eighth Circuit Court of Appeals observed that "[t]he *McDonnell Douglas* analysis is likely still an appropriate way to analyze ADEA "pretext" claims, however, because *McDonnell Douglas* only shifts the burden of production." *Id.* The Eighth Circuit Court of Appeals has continued to apply the *McDonnell Douglas* framework to ADEA cases involving indirect evidence since *Tusing*. *See Holmes v. Trinity Health,* 729 F.3d 817, 821 (8th Cir. 2013); *Ridout,* 716 F.3d at 1083; *Bone v. G4S Youth Servs., L.L.C.,* 686 F.3d 948, 953 (8th Cir. 2012); *Onyiah v. St. Cloud State Univ.*, 684 F.3d 711, 719 (8th Cir. 2012); *Gibson v. American Greetings Corp.*, 670 F.3d 844, 855 (8th Cir. 2012). Accordingly, I will adhere to the Eighth Circuit precedent, as I must, which follows *McDonnell Douglas* in ADEA indirect evidence cases.

## 2. *Prima Facie case*

Because Pick has failed to show direct evidence of age discrimination, I apply the *McDonnell Douglas* burden shifting scheme. To establish a prima facie case of age discrimination in a reduction-in-force, Pick must show that:

> (1) he is over 40 years old, (2) he met the applicable job qualifications, (3) he suffered an adverse employment action, and (4) there is some additional evidence that age was a factor in the employer's termination decision. *See Ward v. Int'l Paper Co.*, 509 F.3d 457, 460 (8th Cir. 2007). Once the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action. *Id.* If the employer does so, the plaintiff must show that the employer's proffered reason was pretext for discrimination. *Id.* At all times, the plaintiff retains the burden of persuasion to prove that age was the "but-for" cause of the termination.

*Rahlf v. Mo-Tech Corp., Inc.*, 642 F.3d 633, 637 (8th Cir. 2011).

Defendants concede that Pick meets the first three requirements of a prima facie case. Defendants argue, however, that Pick cannot satisfy the final element of a prima facie case. That is, that there is some additional evidence that age was a factor in the Utility Board's termination decision. Pick points to List's email to Cluck on April 9, 2012, in which she mentioned that she believed that Pick was eligible for retirement benefits under the Iowa Public Employee Retirement System, IPERS. The flaw in Pick's reliance on List's email is that neither List nor Cluck was a decision maker. The decision to eliminate Pick's position lay with the Utility Board and neither List nor Cluck were members of the Utility Board when the Board decided to eliminate Pick's position.[23]

---

[23]Pick does not argue he should succeed under a "cat's paw" theory that attributes List's motives to the Utility Board. "In a cat's paw case, an employer may be vicariously

There is no evidence in the summary judgment record that either List or Cluck shared List's email with any member of the Utility Board. Moreover, List's email was sent several months before the Utility Board decided to eliminate Pick's position. In sum, I conclude that List's email does not constitute some additional evidence that age was a factor in the Utility Board's decision to eliminate Pick's position. Thus, Pick has not established a prima facie case of age discrimination. Defendants' motion for summary judgment is granted as to Pick's claim of age discrimination under the ADEA or the ICRA.

## H. Gender Discrimination Claims

Defendants also seek summary judgment on Pick's gender discrimination claims found in Count VII of the fourth amended complaint. In response, Pick states that he is withdrawing his gender discrimination claims. Accordingly, this portion of defendants' motion for summary judgment is granted.

## I. Retaliation Claims

Finally, I take up defendants' request for summary judgment on Pick's retaliation claims in Count VIII. Pick asserts two separate claims for retaliation. First, he contends that defendants retaliated against him for requesting an accommodation, additional medical leave, for his disability, in violation of the ADA and ICRA. Second, Pick contends that defendants retaliated against him in response to his attorney's letter on June 26, 2012, advising that Pick was considering taking legal action to enforce his rights under federal and state law. I will consider each of these claims in turn.

---

liable for an adverse employment action if one of its agents—other than the ultimate decision maker—is motivated by discriminatory animus and intentionally and proximately causes the action." *Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 551 (8th Cir. 2013).

## 1. *ADA/ICRA retaliation claim*

The ADA forbids an employer to retaliate against an employee because the employee "opposed any act or practice made unlawful by [the ADA] or because [the employee] made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing" conducted pursuant to the ADA.[24]  42 U.S.C. § 12203(a).  Although "[p]roof of a retaliation claim is not the same as [proof of] a direct claim of disability discrimination," *Foster v. Time Warner Entm't Co., L.P.*, 250 F.3d 1189, 1195 (8th Cir. 2001), a retaliation claim under the ADA is analyzed under a *McDonnell Douglas* burden-shifting framework.  *See Product Fabricators, Inc.*, --- F. 3d. ---, 2014 WL 3971477, at *5; *Stewart v. Independent Sch. Dist. No.* 196, 481 F.3d 1034, 1042–43 (8th Cir. 2007). More specifically,

> Under this framework, the initial burden is on the plaintiff to establish a prima facie case, consisting of evidence: "(1) that he or she engaged in statutorily protected activity; (2) an adverse employment action was taken against him or her; and (3) a causal connection exists between the two events." *Green [ v. Franklin Nat'l Bank of Minneapolis*], 459 F.3d [903,] 914 [ (8th Cir. 2006) ].  If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to show a "non-retaliatory reason for the adverse employment action." *Id*. (quotation marks omitted).  If the defendant can show a legitimate, non-retaliatory reason for its actions, the burden returns to the plaintiff who "is 'then obliged to present evidence that (1) creates a question of fact as to whether [defendant's] reason was pretextual and (2) creates a reasonable inference that [defendant] acted in retaliation.'"

---

[24] Similarly, the ICRA prohibits retaliation against another person "because such person has lawfully opposed any practice forbidden under this chapter, obeys the provisions of this chapter, or has filed a complaint, testified, or assisted in any proceeding under this chapter." IOWA CODE § 216.11(2).

> *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 880 (8th
> Cir. 2005) (quoting *Smith v. Allen Health Sys., Inc.*, 302 F.3d
> 827, 833 (8th Cir. 2002)).

*Stewart*, 481 F.3d at 1043.[25]

Here, Pick engaged in statutorily protected activity when he requested, on June 28, 2012, an accommodation for his disability, that he be permitted to use his accumulated sick leave. *See Kirkeberg v. Canadian Pac. Ry.*, 619 F.3d 898, 907–08 (8th Cir. 2010) (clarifying that a request for an accommodation is a protected activity). The Utility Board subsequently terminated him, which is plainly adverse action against him. Defendants argue that Pick cannot establish the third element, causal connection.

Although I believe that the inferences of retaliatory motive, based on the evidence cited by Pick are weak, that is not the proper basis for summary judgment. *See Torgerson*, 643 F.3d at 1042–43. Rather, viewing the evidence in the light most favorable to Pick, and taking the record as a whole, I cannot say that no rational trier of fact could find in Pick's favor. The Eighth Circuit Court of Appeals has recognized for some time that "[t]he failure of an employer to engage in an interactive process to determine whether reasonable accommodations [of an employee's disabilities] are possible is prima facie evidence that the employer may be acting in bad faith." *Fjellstad v. Pizza Hut of Am.*, 188 F.3d 944, 952 (8th Cir. 1999); *Walsted v. Woodbury Cnty, Iowa*, 113 F. Supp.2d 1318, 1342 (N.D. Iowa 2000) (also concluding that an employer's failure to engage in the interactive process gives rise to an inference of illicit motive or

---

[25]Similarly, "[t]o establish a prima facie case of retaliation under the ICRA, a plaintiff must show (1) he or she was engaged in statutorily protected activity, (2) the employer took adverse employment action against him or her, and (3) there was a causal connection between his or her participation in the protected activity and the adverse employment action taken." *Boyle v.Alum-Line, Inc.*, 710 N.W.2d 741, 750 (Iowa 2006); *see Estate of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 678 (Iowa 2004); *Channon v. United Parcel Serv., Inc.*, 629 N.W.2d 835, 861-62 (Iowa 2001).

bad faith).  Here, there is no evidence indicating that, after Pick's June 28th request for accommodation, any member of the Utility Board made a good faith effort to engage in the interactive process with Pick.  Finally, Pick "may show the causal link based on the temporal relation of the protected activity and the adverse employment action." *Ebersole v. Novo Nordisk, Inc.*, --- F.3d ---, 2014 WL 3361160, at *5 (8th Cir. July 14, 2014); *see Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 866 (8th Cir. 2006).  I conclude that the temporal connection between Pick's protected conduct and the adverse employment action here is sufficient to present a genuine issue of material fact on causation.  *See Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002) ("[The employee's] family leave began on January 1 and [the employer] discharged [the employee] on January 14.  These two events are extremely close in time and we conclude that under our precedent this is sufficient, but barely so, to establish causation, completing [the plaintiff's] prima facie case."); *Foster v. Time Warner Entm't Co.*, 250 F.3d 1189, 1196 (8th Cir. 2001) ("Foster established a temporal connection between her requests for accommodating Terry's disability and her termination, permitting an inference of retaliation."); *O'Bryan v. KTIV Television*, 64 F.3d 1188, 1193–94 (8th Cir. 1995) (holding that three months between filing administrative complaints and firing established causal connection).  Here, approximately two weeks after Pick's June 28th request for accommodation, the Utility Board eliminated his position.  This conclusion, that the temporal connection between Pick's protected conduct and the adverse employment action here is sufficient to present a genuine issue of material fact on causation, is "consistent with the overarching philosophy of the *McDonnell Douglas* system of proof, which requires only a minimal showing before requiring the employer to explain its actions." *Smith*, 302 F.3d at 833.  Accordingly, I conclude that defendants are not entitled to summary judgment on Pick's ADA/ICRA retaliation claim and this portion of their motion is denied.

## 2. *First Amendment retaliation*

Finally, I turn to defendants' request for summary judgment on Pick's First Amendment retaliation claim. As the Eighth Circuit Court of Appeals has explained,

> To establish a § 1983 claim for retaliation in violation of the First Amendment, a plaintiff must allege (1) that [he] engaged in a protected activity, (2) that the defendants responded with adverse action that would "chill a person of ordinary firmness" from continuing in the activity, and (3) that "the adverse action was motivated at least in part by the exercise of the protected activity."

*L.L. Nelson Enters., Inc. v. County of St. Louis, Mo.*, 673 F.3d 799, 807–08 (8th Cir. 2012) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)); *see also Santiago v. Blair*, 707 F.3d 984, 991 (8th Cir. 2013); *Beaulieu v. Ludeman*, 690 F.3d 1017, 1025 (8th Cir. 2012); *Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010).

Defendants contend that Pick cannot establish causation, the third element. Pick relies on the temporal proximity of his attorney's letter and the elimination of his position to generate a genuine issue of material fact on the issue of causation. As I noted directly above, "temporal proximity" may suggest retaliatory intent, at least in employment retaliation cases. *See Ebersole*, --- F.3d ---, 2014 WL 3361160, at *5. In the context of § 1983 First Amendment retaliation claims, however, the Eighth Circuit Court of Appeals has held that "'[t]emporal proximity is relevant but not dispositive.'" *Peterson v. Kopp*, 754 F.3d 594, 603 (8th Cir. 2014) (quoting *Wilson v. Northcutt*, 441 F.3d 586, 592 (8th Cir. 2006)); *accord Morris v. City of Chillicothe*, 512 F.3d 1013, 1019 (8th Cir. 2008); *see also Johnson v. Arkansas State Hosp.*, 282 Fed. App'x 497, 499 (8th Cir. 2008) (holding that First Amendment retaliation claim failed where plaintiff presented no evidence of a causal connection between the speech and the purported retaliatory activity other than the temporal proximity). I conclude that the timing of the decision to eliminate Pick's position raises an inference of retaliatory motive. Pick's attorney sent a letter on

June 26, 2012, advising that Pick was considering taking legal action to enforce his rights under federal and state law. Approximately two weeks later, the Utility Board eliminated Pick's position with the Utility. Viewing the evidence in the light most favorable to Pick, and taking the record as a whole, a rational trier of fact could find that the order and temporal proximity of these events was not coincidental. *See Davison v. City of Minneapolis, Minn.*, 490 F.3d 648, 657 (8th Cir. 2007) ("[T]emporal proximity between protected activity and an adverse employment action can contribute to establishing the [substantial or motivating factor] element of a prima facie case of retaliation."); *McGee v. South Pemiscot Sch. Dist. R–V*, 712 F.2d 339, 343 (8th Cir. 1983) (suspicious sequence of events is one factor to consider in evaluating whether plaintiff's protected speech motivated adverse employment decision).

Here, Pick's demonstration of a causal connection is further strengthened by his evidence that the reasons that defendants gave for eliminating his position were unfounded. The Supreme Court has held that a finder of fact may infer an improper motive from evidence of the falseness of an employer's proffered justification for an adverse action. *See Reeves,* 530 U.S. at 147 ("a trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."). This evidence, combined with the temporal proximity of the events, generates a genuine issue of material fact on the question of a causal link between Pick's protected conduct and the adverse action. Accordingly, I conclude that defendants are not entitled to summary judgment on Pick's First Amendment retaliation claim and this portion of their motion is also denied.

## III.   CONCLUSION

For the reasons discussed above, defendants' motion for summary judgment is granted in part and denied in part as follows:

1.      Count I, defamation claims, summary judgment is granted.

2.      Count II, § 1983 claims, summary judgment is granted.

3.      Count III, intentional infliction of emotional distress claims, summary judgment is granted to the extent that those claims are based on acts of age and disability discrimination.  Summary judgment is denied to the extent that those claims are based First Amendment retaliatory conduct.

4.      Count IV, claims of wrongful termination in violation of the terms of the Manual, summary judgment is granted.

5.      Count V, claims of disability discrimination, summary judgment is denied.

6.      Count VI, claims of age discrimination, summary judgment is granted.

7.      Count VII, claims of gender discrimination, summary judgment is granted.

8.      Count VIII, retaliation claims, summary judgment is denied.

**IT IS SO ORDERED**.

**DATED** this 27th day of August, 2014.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA